UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, | ) ) ) ) | CASE NO. 7:07-CV-00051-GFVT **ELECTRONICALLY FILED** |
| PLAINTIFFS | ) ) | **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO** |
| vs. | ) ) | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN** |
| N.F.C. MINING, INC., ET AL, | ) ) ) | **FAVOR OF A JUDGMENT CONCLUDING COVERAGE IS APPLICABLE** |
| DEFENDANTS | ) ) | |

Come the Defendants, N.F.C. Mining, Inc., Jesse Rudd and Clark D. Pergrem, by counsel, and in response and opposition to the Plaintiffs' Motion for Summary Judgment, submit this Memorandum of Law and further request this Court to make a determination that coverage applies to all claims asserted.

## INTRODUCTION

This matter involves various determinations of the application of insurance coverage with respect to claims allegedly relating to the negligent operation of a coal processing facility owned and operated by N.F.C. Mining, Inc. ("NFC"). As a part of its legal obligations to operate the facility, NFC, through a Kentucky insurance agency, Commercial Insurance Services, Inc. ("CIS"), solicited a quote for comprehensive liability insurance coverage in 2003 from Van Wagoner Companies, a Texas insurance underwriter, under contract with Lloyds of London Insurance ("Lloyds"). The Van Wagoner Companies were authorized to quote and bind Lloyds with regard to issuance of insurance policies. Van Wagoner Companies, after investigating NFC's business, and its insurance needs and requirements, quoted a premium totaling Seven

1

Thousand Three Hundred and Twenty Six Dollars and Twenty Seven Cents ($7,326.27) for general liability and completed operations coverage relating to NFC's operation of a prep plant a/k/a coal processing facility ("prep plant"). NFC paid the quote and the Van Wagoner Companies as Lloyds' agent issued Lloyds insurance policy no. CMC1113 ("Lloyds' Policy"), and thus binding Lloyds.

Simultaneously upon issuance of the Lloyds' Policy and on one subsequent occasion thereafter, Van Wagoner Companies, acting as Lloyds' authorized agent, prepared, issued and transmitted a government required Certificate of Insurance Coverage ("SME-29 Certificate"), to the Kentucky Department of Surface Mining Reclamation and Enforcement ("DSMRE"). A SME-29 Certificate was transmitted to DSMRE in October 2003 and SME-29 Certificate was again in January 2004 (collectively the "SME Certifications"). A SME-29 Certificate is a fundamental material requirement in order for NFC to obtain a legal right through a DSMRE permit to operate the prep plant.

Lloyds certified to the DSMRE, for and on the benefit of NFC, that NFC had purchased all coverages through the Lloyds' Policy and further met all compliance standards and all requirements of 405 KAR 10:030, Section 4.

NFC paid all premiums and, at all times relied upon the representations of Van Wagoner Companies, as a binding agent for Lloyds.

In complete contrast to Lloyds previous representations to Kentucky's regulatory agencies and NFC, and the plain unambiguous text of the SME-29 Certifications, Lloyds now attempts to have this Court issue an order finding the Lloyds' Policy did NOT include all coverage required under 405 KAR 10:030, Section 4.

This action was brought only after NFC had been included as a defendant in the civil action pending, Commonwealth of Kentucky, Floyd Circuit Court Division 1, 05-CI-01297, <u>Jeff</u>

Bartrum et al v. N.F.C. Mining, Inc. (the "Floyd County Action") based on allegations relating to the negligent operation of the prep plant including, but not limited to, the escaping of coal dust. Rather than providing a defense, Lloyds opted to file this action in an effort to denounce any such coverage and leave NFC without any coverage.

## COUNTERSTATEMENT OF PERTINENT FACTS

NFC operated and continues to operate a prep plant located near the community of Goble Roberts in Floyd County, Kentucky. In 2003, as a regular part of its business planning, which includes a plan of compliance with all regulatory requirements, NFC reviewed all existing and anticipated permits obtained, and to be obtained, through DSMRE for the operation of the prep plant. The laws of Kentucky impose specific insurance coverage requirements for the operation of a prep plant, which are set forth with particularity in 405 KAR 10:030.

NFC requested assistance from CIS in obtaining a quote on comprehensive insurance to cover its entire operation and, certainly, to comply with the insurance requirements of 405 KAR 10:030, which must be met before NFC could continue to operate.

CIS contacted the Van Wagoner Companies. Kim Hardy is now, and was in 2003, an underwriter employed with Van Wagoner Companies, who, at that time, contracted with Lloyds and was duly authorized to act as Lloyds' agent. As an underwriter, Ms. Hardy received submissions from agents and brokers seeking insurance packages and quotes. Pursuant to her contract with Lloyds, she can quote and bind Lloyds regarding matters of insurance coverage. (Kim Hardy depo, pgs. 4-6).

In addition to the above job responsibilities, Ms. Hardy decided the appropriate carrier and type of necessary coverage to satisfy the insured's needs. (Kim Hardy depo, pgs. 7-8). In making those decisions, Ms. Hardy specifically considered the occupation of the potential insured, what

type of work they did, and the proximity of the business to third-party homes or dwellings. (Kim Hardy depo, pg. 8 (lines 24-25), pg. 10 (lines 20-25) and pg. 11 (lines 1-3).

In the present instance, Ms. Hardy received a submission for coverage from CIS, which sought to procure a policy of insurance through underwriters at Lloyds for the benefit of NFC. (Kim Hardy depo, pg. 10, (lines 11-19), and pg. 11 (lines 9-11). A copy of the application for insurance coverage submitted to Ms. Hardy on behalf of NFC is attached as Exhibit "A".

Ms. Hardy reviewed the application and knew NFC was a "coal prep plant" and its business would entail "washing of the coal and various other things." (Kim Hardy depo, pg. 12). Ms. Hardy acknowledged, however, she did not know what the "various other things" entailed and she really didn't know how the coal was washed at a prep plant. (Kim Hardy depo, pg. 12 (lines 24-25), pg. 13 (lines 1-3 and 13-15)). Ms. Hardy admitted, in the past, she had always transferred submissions regarding coal prep plants to her former boss, and/or had otherwise relied upon his knowledge of the business and what is required. (Kim Hardy depo, pg. 13 (lines 4-19)).

In the present case, however, Ms. Hardy admits, while it was her duty to investigate NFC's business operations, after allegedly doing so, she did not know anything other than the fact they washed coal, and she further admitted she didn't know how it was washed. (Kim Hardy depo, pg. 13 (lines 20-25), pg. 14 (lines 1-18)).

Ms. Hardy testified NFC application requested CGL, i.e., Commercial General Liability Insurance Coverage, as well as Products/Completed Operations, and Personal and Advertising Injury Coverage. (Kim Hardy depo, pg. 20 (lines 14-25)). She further explained she understood that "general liability" coverage is meant to include "third-party bodily injury and property damage." (Kim Hardy depo, pg. 20 (line 25), pg. 21 (lines 1-2)). Based upon Ms. Hardy's review of the application and her investigation into NFC's business, Ms. Hardy quoted NFC a

4

premium of $6,893.00, plus various fees and surcharges, totaling $7,326.27. (Kim Hardy depo, pg. 31 (lines 12-17)).

Ms. Hardy further explained the procedure she followed in the issuance of the Lloyds' Policy to NFC:

> Q      Okay. So you—would it be fair to say that you received a binding request and any specific exclusions would have came in after you received the binding requests, correct?
>
> A      I sent the Blasting Exclusion and the Subcontractor Exclusion with the quote –
>
> Q      Okay.
>
> A      --for the insured to sign if they want the coverage to be bound.
>
> Q      Okay.
>
> A      When I get the binding request, that's when they sent in the Blasting Exclusion and the Subcontractor Exclusion, signed by the Insured.
>
> Q      Okay. Is that the process that N.F.C. went through?
>
> A      Yes.
>
> Q      Okay. And you received the Blasting Exclusion and you received the Subcontractor Exclusion, correct?
>
> A      Correct.
>
> Q      Did you receive any other exclusions acknowledged by N.F.C?
>
> A      It does not appear so.
>
> Q      Okay. Why didn't you sent them an exclusion for coal dust?
>
> A      **I was unaware of any exclusion like that.** (Emphasis added)

(Hardy depo, pg. 41 (lines 21-25), pg. 42 (lines 1-20))

Ms. Hardy further testified:

5

Q    Do you have anything signed, similar to the Subcontractor Exclusion, by Mr. Rudd or by Mr. Pergrem or anyone on behalf of N.F.C. that this policy would not provide protection in the event of coal dust?

A    I have nothing to that effect.

Q    Okay. Let me ask you this: Do you have any signed exclusions by either Mr. Pergrem or Mr. Rudd on behalf of N.F.C. whereby pollution is excluded?

A.    No.

(Hardy depo, pg. 44 (lines 19-25), pg. 45 (lines 1-3))

Ms. Hardy reviewed the application and confirmed all required signatures were present and dated. (Kim Hardy depo, pg. 46 (lines 9-10)). Ms. Hardy made sure she had the "exclusions that I requested to be signed." (Kim Hardy depo., pg. 46 (lines 11-12)). Ms. Hardy testified that Lloyds specifically requested the "Blasting Exclusion" and the "Subcontractor Exclusion" to be signed and acknowledged by NFC.

The Lloyds' Policy was issued to NFC, which provided coverage to the prep plant effective October 2, 2003. (Kim Hardy depo, pg. 46 (line 20)). A copy of the declaration page of the Lloyds' Policy is attached hereto as Exhibit "B".

Ms. Hardy further testified that the Van Wagoner Companies generally collected 20% of the premium as its fee for underwriting the policy on behalf of Lloyds. (Kim Hardy depo, pg. 32).

To finalize the transaction, Ms. Hardy, as agent for and on behalf of Lloyds, transmitted the SME-29 Certifications to DSMRE confirming NFC had procured the Lloyds' Policy. Ms. Hardy testified she reported the Lloyds' Policy to DSMRE in order to confirm the existence of insurance coverage on NFC's operations. (Kim Hardy depo, pg. 47 (lines 24-25) and pg. 50 (lines 1-9)). Ms. Hardy explained, as the agent for and on behalf of Lloyds, she signed and transmitted

6

to DSMRE a Certificate[1] to the Kentucky Department of Surface Mining Reclamation and Enforcement, on October 7, 2003, advising that NFC was carrying general liability insurance in compliance with 405 KAR 10:030, Section 4. (Kim Hardy depo, pg. 49 (lines 4-25) and pg. 50 (lines 1-17)). Ms. Hardy subsequently executed a supplemental SME-29 Certificate, in January of 2004[2], at the request of CIS for the benefit of NFC, which again confirmed to the DSMRE that NFC had procured all insurance coverage required by 405 KAR 10:030, and made specific reference to the Lloyds' Policy as providing said coverage. Ms. Hardy admits that she did, in fact, sign both SME-29 Certifications before a notary public and submitted them to the DSMRE. (Kim Hardy depo, pgs. 48, 49 and 50).

Ms. Hardy, confirmed that "accidental pollution coverage" is required under the regulation incorporated with and into the SME-29 Certifications, which she signed and transmitted to DSMRE. (Ms. Hardy depo, pg. 51 (lines 23-25) and pg. 52 (lines 1-3)).

Ms. Hardy, in her capacity as agent for Lloyds, also admitted the insurance coverage she certified through the Lloyds' Policy did not include any exclusions. Ms. Hardy testified:

> Q   In order for the permit to remain active, were you aware that it was- -let me restate that. In order for the permit to remain active, were you aware that N.F.C. Mining, Inc., had to procure coverage that satisfied the regulation?
>
> A   Our intention was to let the Department know they were carrying insurance.
>
> Q   Did you tell the Cabinet of any exclusions to that insurance?
>
> A   The only thing that was submitted to the Cabinet was this form.
>
> Q   Does it reference any exclusions?
>
> A   No, it does not."

---

[1] A copy of the SME-29 Certificate is attached as Exhibit C.
[2] A copy of the supplemental SME-29 Certificate is attached as Exhibit D.

7

(Kim Hardy depo, pg. 52 (lines 20-25) and pg. 53 (lines 1-7)).

## I. CLAIMS ALLEGEDLY CAUSED BY "COAL DUST" OR "NOISE" ARE NOT EXCLUDED UNDER THE LLOYDS' POLICY

Lloyds takes the position the Lloyds' Policy does not cover claims which derive from, or are related to, "coal dust" or "noise". Nowhere in the Lloyds' Policy is "coal dust" defined. Further "coal dust" is not within the definition of a "pollutant" under the terms of the Lloyds' Policy. The Lloyds' Policy specifically defines a "pollutant" as:

> "Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminants including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed. (Lloyds' Policy, pg. 12 of 13, a copy of which is attached hereto as Exhibit "E").

Clearly, coal dust is not defined as a pollutant by the Lloyds' Policy. In the Floyd County Action the terms coal dust and "pollutants" are treated independently and are mutually exclusive. Even if one were to assume pollutants were excluded from coverage under the Lloyds' Policy, claims caused or resulting from the negligent emission or escaping of coal dust are still subject to coverage.

As a matter of construction, the Lloyds' Policy clearly excludes claims relating to, or caused by, specific substances, including, but not limited to, "silica dust". (Lloyds' Policy Unnumbered Endorsement Attached hereto as Exhibit "F").

Although "silica dust" is expressly excluded, the Lloyds' Policy is totally silent with respect to a definition of "coal dust". In fact, Lloyds' agent, Ms. Kim Hardy, testified regarding the "definitions" and the specific substances defined as pollutants or excluded from coverage under the Lloyds' Policy as follows:

> Q   What you're speaking of, it says, "Exclusion, Asbestos, Silica Dust, and Toxic Substances," correct?
>
> A   Correct.

> Q   And it has certain exclusions in there; is that correct?
>
> A   Correct.
>
> Q   It doesn't say coal dust anywhere in there, does it?
>
> A   It appears not, no."

(Ms. Hardy depo, pg. 68 (lines 23-25) and pg. 69 (lines 1-7)).

The Lloyds' Policy contains an exhaustive listing defined as pollutants and specific dusts compositions excluded from coverage. However, the Lloyds' Policy fails to identify or categorize "coal dust" within any category of an exclusion and, as such, the coverage applies to the claims in the Floyd County Action.

The Court held in Helberg v. Natl. Union Fire Ins. Co., 102 Ohio App. 3d 679, 657 N.E. 2d 832, (Ohio App. 6 Dist., 1999):

> "Applying the time-honored maim of construction, expressio unius est exclusio alterius, the inclusion of specific things implies the exclusion of those not mentioned." Id at 835.

The Lloyds' Policy expressly excludes "silica dust" as a covered substance. However, the Lloyds' Policy is silent with regard to a definition of pollution that includes "coal dust". Further, the Lloyds' Policy does not exclude "coal dust". As such, the omission of "coal dust" as an excluded substance requires the court to apply the principles long adhered to and conclude claims arising from "coal dust" are not excluded. If, in fact, "coal dust" was a pollutant or an excluded substance (ex. silica dust), the Lloyds' Policy would expressly exclude "coal dust " as it expressly excludes "silica dust".

It is undisputed "coal dust" is a natural material. With respect to NFC's operations, "coal dust" is not manufactured, but is a naturally occurring substance. "Coal dust" is similar in

9

character to sand. Both occur naturally and are not the result of a chemical process nor involve human intervention. In fact, "coal dust" and "sand" are extremely analogous.

The court in Hicks v. American Resources Ins. Co., Inc., 544 So. 2d 952 (Ala. 1989), expressed the view that sand, a natural material, was not a "pollutant" within the meaning of a qualified pollution exclusion.

The court also held in Sellers v. Seligman, 463 So. 2d 697 (La. Ct. App. 4th Cir. 1985), although it is not clear that a qualified pollution exclusion was at issue, in which the court decided that the trial judge erred in granting summary judgment to the insurer on the issue of the applicability of the pollution exclusion, where there were material facts in dispute as to whether the silica dust inhaled by the plaintiff sandblaster in the underlying action constituted an "irritant, contaminant, or pollutant." The court said that the insurance contract was ambiguous and the intention of the parties constituted a genuine issue of material fact that had to be decided at a full trial on the merits.

Likewise, "noise" is not pollutant under the definition provided in the Lloyds Policy and therefore the claims asserted in the Floyd County Action related to noise are not excluded. Noise is sound and sound is an audible vibration. The undersigned Counsel is a loss to respond to this argument given the definition of "pollutant" set forth in the Lloyds' Policy.

The Lloyds' Policy coverages apply with regard to any alleged third party injuries to person or property. Therefore, the Lloyds' Policy provides protection on all claims relating to the emission of noise or the escaping of "coal dust", including, but not limited to, those sounding in trespass or other tort.

## II. THE COVERAGE TERMS SET FORTH IN LLOYDS' POLICY OF INSURANCE ARE AMBIGUOUS AND MUST THEREFORE BE CONSTRUED IN FAVOR OF COVERAGE TO NFC.

Upon a thorough review and comparison of the coverage terms set forth in the insurance policy as a whole, NFC's right to coverage for the multitude of claims asserted against it by the Plaintiffs in the Floyd County Action is ambiguous and must therefore be resolved in favor of NFC.

It is a fundamental rule of construction in the Commonwealth that insurance policies are to be liberally construed, with any doubts resolved in favor of the insured. Kentucky Revised Statute ("KRS") 446.080; see also, State Farm Mutual Auto Ins. Co. v. Shelton, 413 S.W.2d 344, 347 (Ky. 1967). Limitations, or exclusions, of coverage must be clearly stated in an insurance policy so as to apprise the insured of such limitations. St. Paul Fire & Marine Ins. Co., 870 S.W.2d at 227. Where "the terms of an insurance policy are clear and unambiguous, the policy will be enforced as written."Kemper, 82 S.W.3d at 873. However, ambiguous exclusions of coverage are to be strictly construed so as to make insurance effective. *Id.*

The insurance policy is to be construed liberally in favor of insured and if, from language, there is doubt or uncertainty as to its meaning, and it is susceptible to two interpretations, one favorable to insured and the other favorable to insurer, interpretation favorable to insured will be adopted. St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc., 870 S.W.2d 223 (Ky. 1994). *See also*: Kentucky Farm Bureau Mutual Insurance Co. v. McKinney, 831 S.W.2d 164 (Ky. 1992); Webb v. Kentucky Farm Bureau Ins. Co., 577 S.W.2d 17 (Ky. App. 1978); and Davis v. American States Ins. Co., 562 S.W.2d 653 (Ky. App. 1977).

Unless the terms contained in an insurance policy have acquired a "technical meaning in law", the terms must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured. Goodman v. Horace Mann Ins. Co., 100 S.W.3d 769 (Ky. App. 2003).

As will be more fully illustrated herein-below, the coverage "terms" of the Lloyds' Policy are, at a minimum, susceptible to reasonable interpretation by the average man or woman to provide coverage for the various claims asserted against NFC in the Floyd County Action.

### A.   Proper Construction Of The Insurance Policy Requires Review of the SME-29 Certifications.

The SME-29 Certifications filed by Ms. Hardy in her capacity as an agent for Lloyds, must be reviewed along with the policy of insurance in determining whether or not any ambiguities exist. "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it, if possible." City of Louisa v. Newland, 705 S.W.2d 916, 919 (Ky. 1986). The Sixth Circuit has observed that, in construing policies of insurance, which also includes review of benefit certificates, the rule is where ambiguity in the language of these documents is found, the courts will adopt that construction more favorable to the insured. Travelers Ins. Co. v. Burchett, 841 F.2d 155 (C.A.6 (Ky.) 1988).

In the present case, the SME-29 Certifications are, in fact, an affidavit made by an agent for Lloyds, which was submitted to the government. The SME-29 Certifications represent and warrant that the Lloyds' Policy provided NFC with all insurance coverage required by 405 KAR 10:030 ("KAR"). A copy of the KAR is attached hereto as Exhibit "G".

There are no exclusions with the respect to the coverage of the Lloyds' Policy in the SME-29 Certifications. The KAR specifically requires the policy shall provide for "personal injury and property damage protection in an amount adequate to compensate for **all** personal injury and property damage resulting from surface coal mining and reclamation operations." As used in the KAR, and by common usage, the term "all" means "all", and Lloyds cannot now, after having previously attested to the government and NFC that it provided all such coverage, deny coverage by claiming that when they previously said "all," they really didn't really mean "all."

12

Consequently, the court should recognize the ambiguity that exists in Lloyds' Policy and construe the language in favor of coverage for the benefit of NFC.

**B.    The Doctrine of Reasonable Expectations Requires a Finding of Coverage on Behalf Of NFC**

The Lloyds' Policy was purchased by NFC for the sole purpose of insuring risks related to the operation of the prep plant. Jesse Rudd ("Rudd"), NFC's Vice-President, expected the general liability coverage to apply to legitimate third party claims allegedly caused by the negligent escape or inadvertent emission of coal dust. In fact, Rudd explained dust and noise were, and continued to be, the primary potential risks of liability associated with the operation of the prep plant. (Rudd Affidavit at Numerical Paragraph 6, attached as Exhibit "H"). NFC expected the general liability insurance coverage provided by the Lloyds' Policy to cover the primary conceivable risks associated with the prep plant operation. Lloyds' agent investigated NFC's operations and even had available photographs of the coal storage areas and infrastructure. Lloyds cannot, in good faith, take the position the Lloyds' Policy does not insure against the primary conceivable risks associated with NFC's operation of the prep plant.

NFC reasonably expected the claims asserted in the Floyd County Action, which derived from, and are related to, the operation of the prep plant to be covered by the Lloyds' Policy. In fact, Lloyds obviously did also as demonstrated by Lloyds' omission of the specific exclusion. Lloyds required NFC to execute and return specific exclusions confirming blasting operations and sub-contractor operations were not covered under the Lloyds' Policy. A copy of the "Blasting Exclusion" and the Sub-Contractors Exclusion are attached hereto as Exhibits "I" and "J".

No such request was made with respect to coal dust or other operations. Further, Lloyds' agent certified coverage of all NFC operations by and through the SME-29 Certifications (Affidavit of Rudd at Numerical Paragraph 11). It is a fundamental concept that the court is to

look to the reasonable expectations of the insured in interpreting the terms and exclusions present in a policy of insurance. It is clear that an insured is "entitled to all the coverage he may reasonably expect to be provided under the policy." Woodson v. Manhattan Life Insurance Co., Ky., 743 S.W.2d 835 (1987), and Moore v. Commonwealth Life Ins. Co., 759 S.W.2d 598, 599 (Ky. App., 1988). In determining whether to allow a carrier to deny coverage based upon an exclusion in the subject policy, the Court in Moore, citing to Johnson v. American Family Life Assurance Co. of Columbus, (Colo. Dist.), 583 F. Supp. 1450 (1984), noted,

> "[A]n insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection in the mind of the consumer, and then hide behind a technical definition to snatch away the protection which induced the premium payment."

This doctrine has been adopted by the Kentucky Supreme Court in Simon v. Continental Insurance Company, 724, S.W.2d 210 (Ky. 1986). The Supreme Court held:

> "The gist of the doctrine is that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation."

Lloyds cannot and will not be able to establish an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage. Therefore, NFC should be allowed the protection it purchased and the court should find coverage on all claims pending in the Floyd County Action.

### III. LLOYDS IS ESTOPPED FROM DENYING COVERAGE UNDER THE EQUITABLE PRINCIPLES OF NEGLIGENT MISREPRESENTATION AND DETRIMENTAL RELIANCE.

Lloyds is estopped from its denial of coverage for any "accidental pollution" based claims based upon its misrepresentation, through its binding agent, to the Kentucky Department of Surface Mining, Reclamation and Enforcement. Lloyds certified the Lloyds' Policy provided NFC with all coverage mandated under 405 KAR 10:030. The SME-29 Certifications were relied upon by NFC and the DSMRE. Lloyds cannot take a contrary position by claiming ignorance or mistake.

The tort of negligent misrepresentation was first formally adopted in Kentucky in <u>Presnell Const. Managers, Inc. v. E.H. Constr., LLC</u>, 134 S.W.3d 575 (Ky. 2004). The Court in <u>Presnell</u> followed a majority of jurisdictions that adopted the RESTATEMENT (SECOND) OF TORTS § 552 (1977) as follows:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

The record is undisputed NFC was legally obligated to obtain comprehensive insurance to cover its prep plant operations in Floyd County, Kentucky. NFC accurately and comprehensively completed an application providing all requested information regarding its business operations. Ms. Hardy of Van Wagoner Companies, a Texas insurance underwriting company, reviewed the application as well and even requested additional information from NFC. Ms. Hardy admits her duties were to investigate NFC's business, determine how it operates, determine the types of required insurance and to provide a quote for such insurance. Not only does Ms. Hardy admit that, despite her so-called investigation, she knew almost nothing about a Kentucky coal prep plant, how it works, or what happens to the by-products. She further readily admits as an

authorized agent of Lloyds, she executed not one, but two (2) separate documents certifying the coverage of NFC's operations under the Lloyds' Policy. The SME-29 Certifications bear her attested to notarized statement. She, in her capacity as Lloyds' agent, sent two separate SME-29 Certifications to the DSMRE and NFC for use in establishing NFC has the legal right to operate the prep plant. In fact, Lloyds' agent specifically certified that NFC had procured coverage under the Lloyds' Policy in compliance with the requirements of 405 KAR 10:030 without any exclusion.

Rudd, Vice-President of NFC, confirmed he relied upon the SME-29 Certifications of Ms. Hardy in the process of obtaining all necessary permits to operate the prep plant. (Rudd Affidavit at Numerical Paragraphs 10 & 11). Rudd understood the coverage to provide protection on all matters relating to NFC's operations. NFC understood blasting operations were not covered. NFC's operations while involving coal processing, do not involve blasting activities.

Rudd did not expect blasting activities to be covered since NFC was not involved in the actual extraction of coal. In fact, Rudd executed a specific exclusion confirming this expectation. (Rudd Affidavit at Numerical Paragraph 12).

NFC does not use subcontractors on a regular basis. Rudd, in his capacity as Vice-President of NFC, requires any subcontractor to have in place independent coverage prior to entering NFC's property. Likewise, Rudd executed a separate specific exclusion confirming his expectation the Lloyds' Policy did not cover subcontractors. (Rudd Affidavit at Numerical Paragraph 13 ). Rudd believed all other third party matters arising from the operation of NFC's prep plant to be covered by the Lloyds' Policy. (Rudd Affidavit at Numerical Paragraph 14).

Lloyds cannot avoid its responsibility in providing coverage on the claims asserted in the Floyd County Action. Ms. Hardy contends she did not know the insurance requirements imposed by 405 KAR 10:030. However, if not known to her, had Ms. Hardy simply bothered to read 405

KAR 10:030, or even make an inquiry to the DSMRE prior to executing the SME-29 Certifications in October 2003, and again in January 2004, she easily would have learned of the insurance coverage requirements. Clearly, the after the fact position by Lloyds that no accidental pollution coverage is provided under Lloyds' Policy cannot stand. The SME-29 Certifications authored by Ms. Hardy, in her capacity as Lloyds' agent, at a minimum, constitute misrepresentations to both NFC and the DSMRE.

NFC made no further inquiry with regard to the Lloyds' Policy upon the issuance of the SME–29 Certifications. (Rudd Affidavit at Numerical Paragraph 14). At a minimum, Ms. Hardy had a duty to make a reasonable inquiry before simply signing and sending out the SME-29 Certifications. If the SME-29 Certifications had not been submitted to DSMRE and NFC's insurance agency, NFC would not have purchased the Lloyds' Policy. NFC had no reason to solicit or procure any such additional insurance coverage because it relied upon Ms. Hardy's SME-29 Certifications, which warranted that NFC had already procured such coverage from Lloyds. (Rudd Affidavit at Numerical Paragraph 14).

Clearly, had Ms. Hardy, as binding agent for Lloyds, not been negligent in her actions, the issue of insurance coverage could have been addressed when NFC first solicited coverage, and not several years later, after NFC has paid premiums under the belief that it had coverage, only to find out, after being sued by third-parties, that Lloyds, through its agent, Ms. Hardy, allegedly made a mistake in certifying the coverage through the SME-29 Certifications and, consequently, NFC has no insurance coverage regarding the pending claims against it. This clearly cannot be allowed.

NFC relied upon the SME-29 Certifications. NFC had no reason to suspect third party claims for property damage or personal injury were not covered under the Lloyds' Policy. NFC did not seek "accidental pollution" or any additional coverage from any other carrier. NFC relied

upon the SME-29 Certifications. NFC's reliance on Lloyds' agent's misrepresentation has resulted in pecuniary loss, in that, it now faces a civil suit purportedly without the insurance coverage it would have obtained absent Hardy's misrepresentations. There can be no question NFC would have obtained the necessary coverage for its protection. (Rudd Affidavit at Numerical Paragraph 14).

NFC's pecuniary loss is directly related to Hardy's misrepresentations, and therefore, under the Kentucky tort of negligent misrepresentation and the doctrine of detrimental reliance, Lloyds is now estopped to deny coverage regarding the Floyd County Action.

## IV THE PERSONAL INJURY COVERAGE PROVIDED UNDER COVERAGE B IN THE POLICY MAY BE REASONABLY CONSTRUED TO APPLY TO THE PENDING TRESPASS CLAIMS

The trespass claims asserted in the Floyd County Action is covered under Coverage B of the policy. The reasoning is simple, trespass may be accidental in Kentucky. Kentucky law has long observed that trespass in Kentucky can either be intentional and wanton, or innocent and accidental. In Kentucky Harlan Coal Co. v. Harlan Gas Coal Co., 53 S.W.2d 538 (Ky. App. 1932), the court discussed the distinct difference between innocent, i.e., accidental trespass, from that of voluntary or intentional trespass:

> The general rule that, if a trespasser encroaches or enters on the land of another, and willfully and knowingly, or "intentionally and without claim or color of right, made honestly and in good faith," mines mineral and removes the product from the soil, converts it into personalty, and appropriates the converted article, the value thereof at the time it was appropriated is the measure of recovery. North Jellico Coal Co. v. Helton, 219 S. W. 185 (Ky. 1920); Thompson v. Dentzell, 24 S.W.2d 607 (Ky. 1930); New Domain Oil & Gas Co. v. McKinney, 221 S. W. 245 (Ky. 1920). But, if the trespass is made by "innocent mistake," there, the criterion of recovery is the value of the product in place or the reasonable and customary royalty. Ashurst v. Cooper's Adm'r, 23 S.W.2d 916 (Ky. 1930); Middle Creek Coal Co. v. Harris, 290 S.W. 468 (Ky. 1927). To bring himself within the rule controlling a claim against a trespasser for damage committed by him by an "innocent mistake," as this term is applied in such cases, the trespasser must allege and prove such facts as will show his acts were not "willful and

knowingly committed," or not "intentional." Griffith v. Clark Mfg. Co., 279 S.W. 971 (Ky. 1926); Middle Creek Coal Co. v. Harris, *supra*; Liberty Bell Gold Mining Co. v. Smuggler-Union Mining Co., 203 F. 795, 122 C. C. A. 113 (1913).

In the State Court Action, NFC has denied any trespass took place, but in addition to that question of fact, it certainly remains a question of fact as to whether or not the trespass, if proven, was intentional and wanton, or innocent and accidental. Should the judge and/or jury in the State Court Action conclude that a trespass took place, but that said trespass was innocent, then the alleged trespass would qualify as accidental and coverage would exist under Coverage B of Lloyds' Policy.

## VI. LLOYDS' RELIANCE UPON USF&G v. STAR FIRE COALS, INC. IS MISGUIDED

Lloyds attempts to assert United Sates Fidelity and Guaranty Company v. Star Fire Coals, Inc., 856 F .2d 31 as dispositive of the instant case. The facts in Star Fire, id, establish a coal processing plant was never able to consistently control the amount of coal dust discharged from the plant. A series of citations were issued to Star Fire for fugitive dust emissions. In the instant action there is no proof NFC was unable to regularly control dust escapes or NFC received a series of citations. However, neither the Trial or the Appellate Court, in Star Fire, ever made a determination "coal dust" was, in fact, a "pollutant" under the USF&G policy at issue.

The Trial Court held the claims would be subject to USF&G's coverage since the "pollution exception" did not apply if the discharge was "sudden and accidental". The Trial Court's ruling was reversed. The Court of Appeals held the trial court had misinterpreted the application of the "pollution exclusion."

It is a now an issue before this Court as to whether "coal dust", is in fact, a "pollutant" under the terms and conditions of the Lloyds Policy.

## CONCLUSION

For the reasons stated herein, NFC hereby moves this court for an Order overruling the Plaintiffs Motion for Summary Judgment and for the entry of an Order finding the Lloyds' Policy provides protection for all claims asserted in the Floyd County Action.

Respectfully submitted,

KINNER & PATTON
328 East Court Street
Prestonsburg, Kentucky 41653
Telephone No.: (606) 886-1343
Facsimile No.: (606) 886-1349

/s/ *Robert J. Patton*
ROBERT J. PATTON
Counsel for Defendant, NFC Mining, Inc.;
Jesse Rudd and Clark D. Pergrem

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of October, 2009, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF System, which will send a Notice of Electronic Filing to the following:

Hon. Gene F. Zipperle, Jr.
Martin, Ogburn & Zipperle, PLLC
Hurstbourne Place, Suite 1205
9300 Shelbyville Road
Louisville, KY 40222

*s/ Robert J. Patton*
ROBERT J. PATTON
A. DAVID BLANKENSHIP
*Counsel for Defendants*